## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| PHILIP ROESEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HEALTH AND HUMAN SERVICES; | ) | |
| XAVIER BECERRA in his official | ) | |
| capacity as Secretary of the United States | ) | **CIV. NO.** |
| Department of Health and Human | ) | |
| Services; CENTERS FOR MEDICARE & | ) | |
| MEDICAID SERVICES; CHIQUITA | ) | |
| BROOKS-LASURE, in her official | ) | |
| capacity as the Administrator of the | ) | |
| Centers for Medicare & Medicaid | ) | |
| Services, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## COMPLAINT

Philip Roesel ("Roesel" or "Plaintiff") brings this complaint for declaratory and injunctive relief against Defendants the United States Department of Health and Human Services ("HHS"), Xavier Becerra, in his official capacity as Secretary of HHS, the Centers for Medicare & Medicaid Services ("CMS"), and Chiquita Brooks-LaSure, in her official capacity as the Administrator of CMS (collectively, "Defendants"). In support thereof, Roesel states the following:

### NATURE OF THE ACTION

1.      Roesel is an individual who has served for nearly a decade as an authorized agent/broker for consumers seeking to apply for health insurance through the exchanges created by the Affordable Care Act.  In this profession, he has helped tens of thousands of consumers apply for and receive health insurance benefits through qualified health plans. Roesel was a pioneer in

the field and one of the first to perfect web-based enrollment options that provided a convenient and secure means for uninsured consumers to obtain health insurance.

2.     Defendants improperly terminated Roesel's right to continue serving as an agent/broker for consumers and improperly prohibited him from serving in the future for a period of three years.

3.     This final agency action was unlawful under the Administrative Procedure Act, Affordable Care Act, the United States Constitution, and under the very regulation which governs Defendants' relationships with their agents and brokers. Roesel, having no other adequate remedy at law, seeks declaratory and injunctive relief from this Court overturning Defendants' decisions, reestablishing Roesel's status as an agent/broker, and declaring that Defendants' arbitrary and capricious termination and reconsideration processes are unlawful and improper as a matter of both fact and law.

## PARTIES

4.     Plaintiff Philip Roesel is a resident of Wilmington, North Carolina, who has served as an agent/broker for Individual Market Federally-Facilitated Exchanges ("FFEs") and State-Based Exchanges on the Federal Platform ("SSE-FPs") (collectively, "Exchange" or "Exchanges") since Plan Year 2014. He was assigned National Producer Number ("NPN") 2373701 by the National Insurance Producer Registry.

5.     Defendant United States Department of Health and Human Services is a federal cabinet-level department tasked by Congress with administering various healthcare-related statutes. HHS is headquartered at 200 Independence Ave., S.W., Washington, DC 20201.

6.     Defendant Xavier Becerra is the Secretary of HHS. He performs his official duties at offices located at 200 Independence Ave., S.W., Washington, DC 20201. Although the Secretary

has delegated many responsibilities to CMS, he retains legal responsibility for the actions of CMS, including those related to regulation of agents and brokers on Exchanges.

7.      Defendant Centers for Medicare & Medicaid Services, on behalf of the HHS, administers federal law and regulations regarding agents and brokers that participate in Exchanges, including the requirements under Section 1312(e) of the Patient Protection and Affordable Care Act ("ACA"), 48 U.S.C. § 18032(e), and the regulation promulgated thereunder, 45 CFR § 155.220. CMS is headquartered at 7500 Security Boulevard, Baltimore, MD 21244.

8.      Defendant Chiquita Brooks-LaSure is the Administrator of CMS. She performs her official duties at offices located at 7500 Security Boulevard, Baltimore, MD 21244. She retains legal responsibility in her official capacity for the actions of CMS, including those actions concerning agents/brokers participating in Exchanges, and is responsible for ensuring CMS's compliance with law and regulation regarding, *inter alia*, suspension, termination, and reconsideration of Exchange agent/broker agreements and agent/broker statuses.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346. This action arises under, among other federal statutes, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 704, 706. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705-706. Further, the All Writs Act, 28 U.S.C. §1651, grants this Court authority to, among other things, enter preliminary relief to preserve the status quo pending its review of the merits of Roesel's claims. These provisions allow the Court to review Defendants' final agency action as alleged and described in this Complaint; and the APA is the Roesel's only adequate remedy at law with respect to Defendants'

actions. Furthermore, the agency decisions of Defendants described in this Complaint constitute final agency action, and Roesel has exhausted his administrative remedies.

10.     Defendants, which consist of federal agencies and representatives thereof, are all subject to personal jurisdiction in the State of Texas under applicable law and under the Texas long-arm statute, Tex. Civ. Prac. & Rem. Code § 17.042(2), and personal jurisdiction over the Defendants comports with due process under the United States Constitution. Specific personal jurisdiction exists over each of the Defendants because Defendants intentionally directed their conduct to Texas-based consumers and Texas Exchanges, which were expressly referenced in Defendants' Suspension Letter and Investigative Findings, and which Defendants claim support the final agency action at issue. Defendants specifically directed their conduct toward Texas Exchanges and Texas residents in issuing their Suspension Letter and in eventually terminating Roesel as described below.

11.     Roesel has been adversely affected and aggrieved by the Defendants' agency action, which has also caused him to suffer a legal wrong. Roesel has standing because he "has been [and] will in fact be perceptibly harmed by the challenged agency action." *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 688 (1973). The actions of Defendants which Roesel complains of terminated Roesel's rights and seek to prevent Roesel from participating in Exchanges for a prolonged period, through December 6, 2026.

12.     Venue is proper in this district pursuant to 28 U.S.C. §1391(e)(1) because a substantial part of the events giving rise to this action occurred in this district, including, *inter alia*, that several of the allegedly complaining consumers identified by the Defendants resided in this district at the time of their applications, and that Defendants specifically referenced Texas-based

4

consumers and the Texas Exchanges in Defendants' Suspension Letter and Investigative Findings, which they claim supports the final agency action at issue.

## FACTUAL ALLEGATIONS

### I.   Exchanges on the Federal Platform and Agents/Brokers Generally.

13.     The Affordable Care Act was enacted in order to, *inter alia*, expand consumers' access to health insurance and to simplify the health insurance enrollment process. *See* 42 U.S.C. § 18031. To that end, the ACA provided for the funding of Exchanges wherein eligible consumers can apply for and enroll in qualified health plans ("QHPs"). The ACA requires the HHS Secretary to "establish procedures under which a State may allow agents or brokers . . . to enroll individuals . . . in any qualified health plans in the individual . . . market" and "to assist individuals in applying for premium tax credits and cost-sharing reductions for plans sold through an Exchange". 42 U.S.C. § 18032(e); *see also* 45 CFR § 155.220 (the "Agent/Broker Regulation").

14.     In accordance with the ACA and the Agent/Broker Regulation, licensed agents and brokers help consumers apply for and enroll in QHPs by providing consumers with guidance on plan options in their local area, working with individual consumers one on one, and helping consumers enroll in coverage that fits their needs.[1]

15.     Brokers and agents are a common source of help to consumers in navigating and obtaining QHP coverage,[2] including through the use of internet websites, as permitted by the Agent/Broker Regulation.

---

[1] *See* Agents and Brokers in the Marketplace, CMS, https://www.cms.gov/sites/default/files/2020-10/Agents-and-Brokers-in-the-Marketplace.pdf (last visited April 8, 2024).

[2] *See* Joachim Hero, et al., *Decision-Making Experiences Of Consumers Choosing Individual-Market Health Insurance Plans*, HEALTH AFFAIRS (March 2019) (finding "Brokers represented the most common source of help both on and off Marketplace, followed by family or friends, but off-Marketplace respondents were almost twice as likely to have received assistance from brokers than on-Marketplace respondents (40 percent versus 23 percent). Only 5 percent of on-Marketplace respondents received help from customer service representatives or navigators."); *see also* Anna D. Sinaiko, et al., *Shopping Behavior and*

5

16.     According to the Agent/Broker Regulation, HHS may terminate the rights of an agent, broker, or web-broker (and "Agent/Broker") only "for cause." 45 CFR 155.220(g)(1), (g)(5)(ii). There are two types of for-cause terminations under the Agent/Broker Regulation: (1) terminations for noncompliance, and (2) terminations for "fraud" or "abusive conduct that may cause imminent or ongoing consumer harm." *Id.*

17.     Under the Agent/Broker Regulation, the requirements imposed upon CMS when it wishes to terminate an Agent/Broker for noncompliance differ from the requirements that CMS must follow when it desires to terminate an Agent/Broker for "fraud" or "abusive conduct[.]" *Compare* 45 CFR 155.220(g)(1) *with* 45 CFR 155.220(g)(5)(ii).

18.     Regarding noncompliance, CMS is only allowed to terminate an agent/broker "for cause" if the following requirement is met: "If, in HHS' determination, a *specific finding* of noncompliance or pattern of noncompliance is *sufficiently severe*, HHS *may* terminate an agent's, broker's, or web-broker's agreement with the Federally-facilitated Exchange for cause." 45 CFR § 155.220(g)(1) (emphasis added).

19.     If an agent/broker is found to be noncompliant, CMS must provide him with an opportunity to cure such noncompliance before it may terminate the agreement for cause. 45 CFR 155.220(g)(3)(i) (allowing the agent/broker to attempt to "resolve[]" the matter "to the satisfaction of HHS.").

20.     In summary, according to the plain language of the Agent/Broker Regulation, a termination for noncompliance (including noncompliance with the Agent/Broker Regulation) generally requires a "specific finding" of noncompliance, a determination that the noncompliance

---

*Challenges: Lessons From Two State-Based Marketplaces*, MEDICAL CARE RESEARCH AND REVIEW, Vol 64, No. 4 (2019) (finding that "Respondents use multiple sources of information to learn about plan. Most (78%) visited the marketplace online, and substantial numbers called the marketplace (42%) and/or used a broker (34%). Very few talked to assistors in the community.").

is "sufficiently severe" to warrant termination, advance "notice" to the agent/broker, and a 30-day opportunity for the agent/broker to cure the alleged noncompliance. 45 CFR 155.220(g)(1), (g)(3)(i).

21.     There is only one exception to these general requirements regarding noncompliance. CMS can "immediately terminate the agreement for cause upon notice to the agent or broker without any further opportunity to resolve the matter" only when "an agent or broker fails to maintain the appropriate license under State law as an agent, broker, or insurance producer" in the territories in which the agent or broker operates. 45 CFR 155.220(g)(3)(ii). This exception does not apply here because Roesel has maintained his licensure.

22.     The Agent/Broker Regulation treats allegations of fraud or abusive conduct differently. HHS may immediately *suspend* an agent/broker's rights, without notice, for a period of no more than 90 days if the agency "reasonably suspects" that the agent/broker "may have" engaged in fraud of abusive conduct that may cause imminent or ongoing consumer harm.  45 CFR 155.220(g)(5)(i)(A).

23.     If an agent/broker's rights are suspended, the agent/broker "may submit evidence in a form and manner to be specified by HHS, to rebut the allegation" of fraud or abusive conduct. 45 CFR § 155.220(g)(5)(i)(B).

24.     If the rebuttal evidence does not persuade HHS to lift the suspension, HHS is not necessarily required to allow the temporary suspension to expire. It may conduct a for-cause termination proceeding. 45 CFR § 155.220(g)(5)(i)(B). Specifically, under these circumstances, HHS "may terminate . . . for cause under paragraph (g)(5)(ii) of this section." *Id.*; *see* 45 CFR § 155.220(g)(5)(ii) (requiring a "finding or determination . . . that an agent, broker, or web-

broker engaged in fraud, or abusive conduct that may result in imminent or ongoing consumer harm . . . .").

25.     Only if there is a "finding or determination" that the agent/broker actually engaged in abusive conduct or fraud may the agency immediately terminate the agent/broker agreement without allowing an opportunity to cure. 45 CFR 155.220(g)(5)(ii).

26.     If Defendants find that an agent, broker, or web-broker has failed to comply with the Agent/Broker Regulation, the agent, broker, or web-broker may also "be denied the right to enter into agreements with the Federally-facilitated Exchanges in future years" if CMS complies with the procedures for a for-cause termination. 45 CFR § 155.220(k)(1)-(2).

27.     If an agent, broker, or web-broker's is terminated, the agent or broker may request reconsideration within 30 days of the written notice of termination. 45 CFR § 155.220(h)(2).

28.     The Agent/Broker Regulation does not expressly state who has the burden of proof in a for-cause termination proceeding, which standard of proof applies, what evidence may be considered, or what the elements of "fraud" or "abusive conduct that may cause imminent or ongoing consumer harm" are in this context. However, principles of due process and statutory construction require that the HHS has the burden of finding, by the preponderance of evidence— using only evidence made available to the agent/broker--that the agent/broker willfully engaged in the alleged misconduct and that the misconduct proximately caused harm.

29.     The federal regulations do not set forth the standard of review on reconsideration by HHS and CMS. They merely state that CMS "will provide the agent, broker, or web-broker with a written notice of the reconsideration decision within 60 calendar days of the date it receives the request for reconsideration." 45 CFR § 155.220(h)(3). However, principles of due process and statutory construction require a neutral HHS official  to conduct a *de novo* review.

30.     In the correspondence related to the termination, Defendants contend that termination was appropriate, even though there was no finding or determination that Roesel actually engaged in fraud or abusive conduct, because Roesel failed to rebut its "reasonable suspicion." This position places the burden on the wrong party (Roesel instead of HHS) and applies the wrong standard—proof beyond a reasonable suspicion instead of a preponderance of the evidence. Furthermore, as discussed below, the final agency action was expressly based on documents and information that Roesel did not have access to and, therefore, to which he never had a fair opportunity to respond.

31.     Defendants' position that Roesel could be terminated absent an actual finding or determination of fraud or abusive conduct, or absent a finding of sufficiently severe noncompliance, violates the requirements in the Agent/Broker Regulation. 45 CFR 155.220(g)(5)(ii), (g)(1).

32.     In terminating Roesel, Defendants misinterpreted and violated their own Agent/Broker Regulation. As is apparent in the correspondence related to the termination, Defendants erroneously terminated Roesel on the mere basis of a failure to rebut a purported "conclusion of a reasonable suspicion of fraudulent or abusive conduct," and *not* on the basis of any finding or determination that any such conduct, in fact, took place. Notably, the Termination Notice to Roesel stated:

> After reviewing your rebuttal and determining that it was insufficient to reverse the conclusion of a reasonable suspicion of fraudulent or abusive conduct, **CMS is now terminating your PY 2023 FFE Agreements for the duration of the current plan year. You will also be prohibited from entering into agreements with CMS and completing FFE registration until December 6, 2026, a 3-year period effective as of the date on this letter.**

*See* Termination Notice dated December 6, 2023 (the "Termination Notice"), **Exhibit 1** (emphasis in original).

33.     The language in the Termination Notice demonstrates that Defendants patently misread the Agent/Broker Regulation, which allows for *suspension* "if HHS reasonably suspects" fraudulent or abusive conduct, but allows for *termination* for fraudulent or abusive conduct only "for cause under ***paragraph (g)(5)(ii)*** of this section." *Id.* (g)(5)(i)(B) (emphasis added). The direct reference to paragraph (g)(5)(ii) in paragraph (g)(5)(i)(B) is critical. In purporting to terminate Roesel for cause because he did not "reverse the conclusion of a reasonable suspicion of fraudulent or abusive conduct," and in failing to instead proceed to paragraph (g)(5)(ii) and make an actual "finding or determination" or fraudulent and abusive conduct, Defendants misinterpreted the Agent/Broker Regulations in direct violation of the APA.

34.     On the issue of reconsideration, Defendants provided Roesel with no standard of review, nor any information relative to Roesel's specific burden in seeking to reverse the agency's initial suspension decision. The Agent/Broker Regulation provide no guidance on this issue either.

35.     The Code of Federal Regulations contains no guidance regarding an agent/broker's ability to obtain and review the information on which Defendants relied in arriving at the suspension or termination decision. 45 CFR § 155.220(g)(5)(i)(B).

36.     Prior to suspending and terminating Roesel, Defendants undertook no investigation that included gathering information from Roesel.

37.     In suspending and terminating Roesel, Defendants received information that was not revealed to Roesel. Defendants even refused to provide Roesel all relevant information in its possession upon the same being demanded.

38.     Defendants required Roesel to pursue a Freedom of Information Act ("FOIA") request to obtain information relevant to Defendants' decision and relied upon by Defendants in arriving at their decisions.

39.     At the time Defendants required Roesel to pursue a FOIA request to obtain relevant information on which Defendants relied in arriving at their decision, Defendants were actually aware that obtaining any information from CMS through such a request would take many months, if not years, and that Roesel's deadlines were far ahead of such dates—rendering a FOIA request meaningless in connection with Roesel's effort to rebut Defendants stated suspicion(s).

40.     In suspending and terminating Roesel, Defendants considered and relied upon information that was not communicated to Roesel and that Roesel had no opportunity to meaningfully rebut. All information gathered, reviewed, or specifically relied upon by Defendants in connection with any investigation or decision-making process relative to Roesel is properly part of the administrative record in this case.

41.     As noted in the Agent/Broker Regulation, Defendants' reconsideration "decision will constitute HHS' final determination." 45 CFR § 155.220(h)(3). Thus, the regulations at issue acknowledge that a reconsideration decision under 45 CFR § 155.220(h) constitutes "final agency action" which is reviewable under the APA. *See* 5 U.S.C. § 704.

**II.     Standards of Conduct Regarding Consumer Consent and Application Accuracy.**

42.     Agents and brokers who participate in Exchanges are subject to certain general standards of conduct outlined in 45 CFR § 155.220(j)(2), including providing consumers with correct and non-misleading information, providing Exchanges with correct information, and confirming that consumers' information is accurate. However, federal regulations do not provide agents and brokers with guidance on specifically how or when they must obtain consumer consent

or how to document a consumer's confirmation of application accuracy. *See* 45 CFR § 155.220(j)(2)(ii)(A). As recognized by Defendants themselves:

> CMS's Exchange regulations ***do not*** prescribe a standard format or process for obtaining the consent or for maintaining its record, so agents and brokers should comply with the terms of their agreements with CMS when determining how they will meet the FFM's consent requirement. While the FFM ***does not*** provide a form, or specify that a form must be signed, agents and brokers ***can*** use a Broker of Record form from an issuer or state Department of Insurance (DOI) to satisfy this requirement. Additionally, an agent or broker ***may*** obtain consent verbally (such as over the phone), electronically (such as via email), or in person.
> . . .
> At a minimum, the consent should acknowledge that the agent or broker has informed the individual, employer, or employee of the functions and responsibilities that apply to the agent's or broker's role in the Marketplace.

*See* CMS, *Overview of Marketplace Requirements for Agents and Brokers*, updated June 5, 2018 (emphasis added).[3]

43.     In further guidance issued by CMS for Plan Years 2022 and 2023, CMS again confirmed that "[t]here is no standard format for this consent" and then listed out certain recommendations. *See* CMS, *Preparing for Plan Year (PY) 2022 Open Enrollment*, dated Sep. 23, 2021, at p. 28;[4] *see also* CMS, *Preparing for Plan Year (PY) 2023 Open Enrollment*, dated Sep. 22, 2022.[5]

44.     CMS did not enact specific "consent documentation requirements" until June 18, 2023, which, as described below, is not the time period relevant to any of the consumers identified in the Defendants' Investigative Findings and not applicable to the Notice of Termination

---

[3] https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Marketplaces/Downloads/AB-MarketplaceRequirements-TipSheet-June52018.pdf (last visited April 8, 2024).
[4] https://www.cms.gov/sites/default/files/2021-10/Preparing%20for%20Plan%20Year%202022%20Open%20Enrollment.pdf (last visited April 8, 2024).
[5] https://www.cms.gov/files/document/preparing-plan-year-2023-open-enrollment.pdf (last visited April 8, 2024).

regarding Roesel's agent/broker status. *See* CMS, *Marketplace Compliance and Agent/Broker Regulations*, updated May 24, 2023, at p. 14) ("The [consent] documentation . . . requirements go into effect beginning June 18th, 2023.").[6]

45.     Similarly, regarding consent and confirmation of accuracy, applicable federal regulations impose a requirement only that an agent or broker "document that eligibility application information has been reviewed by and confirmed to be accurate by the consumer, or the consumer's authorized representative designated in compliance with § 155.227, prior to the submission of information . . . ." 45 CFR § 155.220(j)(2)(ii). The regulations then go on to provide "non-exhaustive examples of acceptable documentation . . . ." *Id.*

46.     As described above and admitted in Defendants' own publications, Defendants' consent and documentation guidelines during the time period relevant the allegations leading to Roesel's suspension and termination were non-specific, vague, and did not set forth any clear standards. *See* 45 CFR § 155.220(j) *passim*.

## III.     Roesel's Practices as an Agent/Broker, Including Consent and Verification Practices.

47.      Roesel has served as an agent/broker and has assisted consumers in obtaining QHPs since Plan Year 2014. Prior to the October 26, 2023, Notice of Suspension by CMS, Roesel assisted consumers with QHP enrollment through his website www.healthinsurancerep.com (the "Website").

48.     During Plan Years 2022 and 2023 (the "Relevant Time Period"), Roesel oversaw and supervised a team of approximately thirty agents who assisted him in verifying the accuracy of consumer information, answering questions of consumers regarding enrollment, and ensuring consumers' knowledge and consent of their applications and enrollment. Roesel also oversaw and

---

[6] https://www.cms.gov/files/document/ab-summit-2023-compliance.pdf (last visited April 8, 2024).

supervised approximately twenty support staff who assisted with matters not requiring licensure during Plan Years 2022 and 2023.

49.     As to the Website, during the Relevant Time Period, site visitors/consumers were initially asked screening questions. Specifically, they were first asked how many people needed coverage, and were given the options: 1, 2, or 3+. Consumers were then asked if they are married or claim anyone else on their taxes.

50.     After answering the screening questions, consumers on the Website were then allowed to fill out a Consent Form on the Website which allows them to initially request assistance with their application for enrollment in a QHP and the enrollment itself.

51.     Consumers on the Website would manually type in their full name, gender, address, phone number, email, date of birth, most recent job description, projected monthly income, Social Security Number (SSN), whether there is additional information Roesel may need to pick the right plan, and plan choice. Consumers were also asked to complete a simple math question which allowed the Website to verify that the application is not being submitted by an automated bot.

52.     All of the categories of consumer information on the Website's Consent Form were manually entered by the consumer. For example, as to the "job description" category, consumers manually enter the information—rather than a drop-down menu with limited options, the consumers type in their answer to such questions. For projected monthly income, consumers could type in an amount and/or click a box indicating that they were looking for a job making minimum wage or better.

53.     Prior to submitting the consent form, consumers each clicked a button that said: "YES! I give my permission to apply for free health insurance!"

14

54.     In submitting the consent form online, consumers that used Roesel's Website expressly agreed to, among other things:

>  If a free plan doesn't exist for your situation, then the insurance company will send you a bill. You are not obligated to pay the bill if you do not want health insurance.
>
>  You agree that we can send automated text messages, emails, or voice recordings to notify you if anything is needed on your account.
>
>  You agree that you have given us permission to apply for health insurance and advanced premium tax credits using the federal or state health insurance marketplace.
>
>  You agree that your information supplied on the application is accurate to the best of your knowledge.
>
>  You agree that you allow your agent, or an employee that works for your agent, to access your healthcare.gov account to help renew your coverage, respond to requests for more information, or to update items needed or requested.
>
>  You agree that you are giving permission for your agent to take over as agent of record on your account, which is required to complete the above tasks, and to notify you if your account has requests for more information. If we think you have the best plan for your needs, we will take over as broker and leave you on that plan….

([https://healthinsurancerep.com/sign-up-online/](https://healthinsurancerep.com/sign-up-online/)). Consumers were also encouraged to "Please correct errors before submitting [the] form." (*Id.*)

55.     During the Relevant Time Period, in addition to requiring consumers to input the aforementioned, detailed information on the consent form, and requiring applicants to indicate clearly that they gave Roesel express permission to apply for health insurance on their behalf, Roesel used other safeguards to verify that consumers authorized him to assist with the consumers' applications, e authorized him to submit the application and to have full knowledge of his role in assisting them with the submission and enrollment. For example:

A. The Website was equipped with a third-party service that screened out consent forms completed artificially or completed by bots. Furthermore, the Internet Protocol ("IP") address and geolocation data were reviewed. If the IP address did not match the geolocation data, or the system indicated that the consumer

was in a state in which Roesel did not conduct business, the Website would inform consumers that they are not permitted to submit the consent form.

B. After the consent form was completed online, the Website verified certain information provided through third party verification services, including by ensuring that the telephone number provided by the consumer was a valid telephone number, and that the email address provided by the consumer was a valid email address.

C. Roesel also utilized verification services to ensure that the United States Postal Service mailing addresses provided by consumers were valid addresses.

D. After the consent form was submitted, a service called Ninja Forms automatically captured all of the data submitted, including whether the consumer checked the box indicating that they expressly consented to Roesel's assistance with the enrollment process and with the submission of the application.

E. After each consumer submitted a consent form, they received an automatic SMS text message from a service called ClickSend asking them to confirm consent. This additional layer of consent was designed to ensure that the consumer had possession of the valid phone number they submitted on the consent form, and to obtain additional evidence of consent.

F. In addition, after a consumer submitted a consent form, the Website (www.healthinsurancerep.com/thank-you-for-signing-up) directed them to call an automated consent confirmation line where the consumer confirmed verbally that they had specifically consented to Roesel assisting them with the

application and enrollment process. Roesel's system verified that the phone number used by the caller was associated with the information provided in the consent form.

56.     During the Relevant Time Period, approximately 24 to 48 hours after obtaining consent from the consumer through the Website, obtaining consent to enroll, and attempting to verify the consent by text message and a phone call, Roesel would submit the application to CMS using the data provided by the consumer.

57.     Roesel provided periodic updates to the applicants regarding the status of their applications using an automated communication service from a third-party company called AgencyBloc. Roesel would also track whether these email updates were deliverable and/or opened by applicants post-submission. Specifically, AgencyBloc recorded whether the applicant viewed and responded to those emails.

58.     The information provided in each consumers' application for a QHP, including the information regarding job descriptions, income, and contact information, were exactly the same information provided by the consumers themselves.

59.     At times, there were similar job descriptions or income amounts on applications submitted, or a consumer may themselves provide erroneous information. However, those instances are a result of consumers inputting the information into the Website, and not the result of any actions taken by Roesel or persons under Roesel's supervision. Roesel relied on the information provided to him by the consumers, including their confirmation that the information in their consent forms is true and accurate, and relied on the multiple verification steps referenced above.

60.     During the Relevant Time Period, it was not uncommon for different consumers to self-report similar information regarding their income, job descriptions, or other categories. The information submitted to the Exchange was derived directly from the information provided by and verified by consumers, and they would manually enter that information (rather than through a dropdown menu with limited options). For example, to the extent consumers reported incomes of approximately $1,680 per month, that number would be attributable to consumers representing that they make (or project making) minimum wage.

61.     During the Relevant Time Period, multiple consumers or applicants may have typed in similar job descriptions when utilizing Roesel's Website. Again, that was not the result of any fraudulent conduct by Roesel. Instead, those similarities were likely the result of Google or other types of advertising that Roesel utilized, which may have caused advertisements to be shown to people with specific or similar job types that can be broadly characterized, such as cashiers or self-employment. For example, Roesel used an advertisement mechanism called "lookalike" audiences through Facebook and Google, through which Facebook and Google targeted advertisement to audiences with similar job titles and other categories.

62.      During the Relevant Time Period, it was also common for Roesel to process numerous consumer requests and applications daily. Like many other agents/brokers, and as authorized by CMS, Roesel operated a call center with approximately thirty persons who he supervised and who were authorized to assist with the processing of applications through Roesel's NPN.

63.     All of the foregoing are common practices in the industry.

64.     All of the foregoing are compliant with all prevailing and applicable regulations, and none violate any guidance, terms, procedures or rules announced by Defendants.

65.     Use of the procedures and tools described above allowed Roesel to confirm that he had consent from each and every customer who sought Roesel's help with procuring insurance.

66.     None of the procedures described above violate any federal law or regulation, nor any rule promulgated by Defendants.

**IV.     The Suspension and Termination of Roesel's Exchange Agreements.**

67.     On October 26, 2023, Defendants, through CMS, provided Roesel with a Notice of Immediate Suspension of Plan Year ("PY") 2023 Exchange Agreements (the "Suspension Letter"), stating that "CMS is suspending [Roesel's] PY 2023 Agreements for 90 calendar days, effective as of the date of this notice" due to a purported "reasonable suspicion" of fraud or abusive conduct. (*See* Suspension Letter, **Exhibit 2**.)

68.     Included with the Suspension Letter was an Attachment which identified Defendants' Investigative Findings and Determination (the "Investigative Findings" or "Attachment").

69.     In the Attachment, CMS identified three categories of findings: (1) Consumers A through J, for whom CMS claimed that applications and/or policies for coverage through the Florida, Georgia, Missouri, South Carolina, Tennessee, and Texas Exchanges were made "without their authorization or knowledge;" (2) "Inaccurate information" for Consumers A through J, such as information regarding marital status, household composition, household income, income source, and existing healthcare coverage; and (3) unspecified "data analytics" regarding applications submitted through Roesel's Exchange User ID, including (a) 179 consumer complaints alleging fraud or misconduct, 69 of which resulted in the cancellation of insurance policies; (b) "Days in which more policies were submitted than would be reasonably possible by one A/B," (c) "The anomalous use of a common household income amount across a significant

portion of applications, and (d) "The anomalous use of a common self-employment work type (e.g., plumber) across a significant portion of applications."

70.    After receiving the Suspension Letter, Roesel requested the identities of Consumers A through J identified in the Investigative Findings, and CMS provided information of those ten (10) consumers. Defendants did not provide the other information and documents that were received or reviewed in connection with Defendants' investigation and those, if any, that Defendants specifically relied upon in arriving at the agency decision and that served as a basis for the suspension, including but not limited to the "data, complaints filed with the Exchange Call Center, and interviews conducted with consumers," "data analytics," "179 consumer complaints" throughout 2022 and 2023, the identities of those 179 complainants, information regarding the 69 policies which were purportedly cancelled, the "data analytics" used by Defendants, and findings of "anomalous use of" data (hereinafter collectively referred to as the "Underlying Data").

71.    Roesel provided Defendants with a response and "rebuttal evidence" pursuant to 45 CFR § 155.220(g)(5)(i)(B) on October 26, 2023, and October 29, 2023, with the information Roesel had received from Defendants. Specifically, Roesel provided CMS with Consent Verification forms for Consumers A through J identified in the Attachment, audio recordings for several of the consumers identified in the Attachment, emails, and other written confirmation and evidence rebutting Defendants' findings of fraud or abusive conduct.

72.    In the Notice of Termination dated December 6, 2023, CMS concluded that Roesel's rebuttal evidence "was insufficient to reverse the conclusion of a reasonable suspicion of fraudulent or abusive conduct," and stated: "CMS is now terminating your PY 2023 FFE Agreements for the duration of the current plan year. You will also be prohibited from entering into agreements with CMS and completing FFE registration until December 6, 2026, a 3-year

period effective as of the date on this letter." The Notice of Termination referenced a 30-day deadline to request reconsideration pursuant to 45 CFR § 155.220(h).

73.    The Notice of Termination did not identify any "finding or determination" of actual fraudulent or abusive conduct, which is required for an agent/broker to be terminated under the Agent/Broker Regulation, and Defendants never made any such findings or determinations. 45 CFR § 155.220(5)(ii). Instead, the Notice of Termination merely referred to a "conclusion of a reasonable suspicion of fraudulent or abusive conduct," which (even if true) would only give rise to a suspension under paragraph (5)(i), and not a termination "for cause under paragraph (g)(5)(ii) . . . ." 45 CFR § 155.220(5)(i)(B).

74.    On December 19, 2023, CMS finally provided Roesel with some information related to its Investigative Findings. However, rather than providing all of the Underlying Data and allowing Roesel to fully review and rebut the Investigative Findings, Defendants merely provided Roesel with the first and last names of only 129 of the 179 consumers who allegedly issued complaints against him.

75.    On December 19, 2023, Roesel's counsel also submitted a Data Use Agreement and Document Request to CMS (*see* **Exhibit 3**). Roesel's counsel followed up regarding the aforementioned request via email on December 22, 2023, and also requested a 30-day extension of time to for Roesel to submit its request for reconsideration pursuant to 45 CFR § 155.220(h).

76.    CMS did not respond to Roesel's requests for information and an extension until January 4, 2024, on the eve of the January 5, 2024 reconsideration deadline. In its response email, CMS falsely claimed to have "released all of the consumer names in accordance with the revised Data Use Agreement executed on December 19, 2023." It further stated: "No more additional

21

information will be released pursuant to your reconsideration request, and an extension to the January 5th due date will not be granted."

77.     The aforementioned behavior by Defendants is revelatory. Not only did it deprive Roesel of due process or any reasonable ability to rebut the accusations against him, but Defendants' arbitrary decision refusing to extend the deadline to allow itself time to provide Roesel with information on which Defendants relied in suspending and terminating Roesel exposed Defendants' intent to terminate Roesel regardless of the rebuttal evidence that he provided. It revealed Defendants' capriciousness in the starkest terms.

## V.     Defendants' "Reconsideration" Process.

78.     As discussed *supra*, once an agent or broker is terminated, the agent or broker may request reconsideration of the decision pursuant to 45 CFR § 155.220(h). Upon a request for reconsideration, Defendants are required to "provide the agent, broker, or web-broker with a written notice of the reconsideration decision within 60 calendar days of the date it receives the request for reconsideration. This decision will constitute HHS' final determination." 45 CFR § 155.220(h).

79.     The aforementioned provision, 45 CFR § 155.220(h), consists of the only regulatory language which discusses or describes the reconsideration process. That provision does not provide any standard of proof for overcoming the Defendants' termination decision, does not describe what information Defendants will consider upon reconsideration, does not provide that an agent or broker will be provided with the facts or data underlying the termination decision, does not state that the reconsideration request would be reviewed by a neutral official, and does not have any language which would allow an agent or broker to meaningfully request reconsideration of a decision to terminate their rights.

80.     On January 5, 2024, Roesel timely submitted a formal Request for Reconsideration Pursuant to 45 CFR § 155.220(h) (the "Request for Reconsideration"), attached hereto as **Exhibit 4**.

81.     In connection with his Request for Reconsideration, Roesel submitted an Affidavit which included a variety of information, documents, and data which rebutted Defendants' findings of fraud or other wrongful conduct. Roesel's Reconsideration Affidavit, excluding the documents and data attached to the Affidavit, is attached hereto as **Exhibit 5**.

82.     Specifically, in connection with his Request for Reconsideration, Roesel provided screenshots to CMS demonstrating that the various consumers at issue received, opened, and viewed emails sent regarding the applications.

83.     Roesel also provided Defendants the raw Ninja Form Data for the consumers identified as Consumers A through J in the Attachment to the Notice of Suspension is being submitted to the CMS Box contemporaneously with this Affidavit.

84.     Roesel also provided Defendants the raw Ninja Form Data for 116 of the other consumers which were subsequently identified by CMS as having submitted complaints was also submitted to CMS. However, since CMS refused to provide Roesel with additional identifying information other than first and last names, Roesel was unable to identify certain specific consumers listed by CMS. For example, the name "Tammy Smith" generated 25 separate applications/consumers, "Samantha Smith" generated 15 consumers, and "Mary Coleman" generated 8 consumers. Upon reconsideration, Roesel provided Defendants with the data for consumers that he was able to reasonably identify.

85.     For avoidance of doubt, Defendants had necessary identifying information for each consumer and could have provided the same to Roesel. Defendants instead hid that information

and then suspended and terminated Roesel in part (presumably) based upon the fact that he could not identify the specific consumer sufficiently to rebut Defendants' suspicion—even though he was able to provide enough evidence to rebut any reasonable suspicion related to each and every consumer that CMS identified.

86.     Roesel also provided Defendants with available voice recordings of calls made to Roesel's automated consent confirmation line, regarding consumers which Roesel could reasonably identify based on the limited information provided by the Defendants.

87.     The information provided by Roesel during and prior to the Request for Reconsideration demonstrated that Roesel followed the consent and verification requirements applicable to agents and brokers, that he carefully utilized multiple tiers of consent and verification, that consent and verification were important to Roesel, and that Roesel did not engage in any fraudulent or abusive conduct at any time during the Relevant Time Period. Nonetheless, Defendants denied Roesel's Request for Reconsideration in a letter dated March 4, 2024. (Reconsideration Decision, **Exhibit 6**.)

88.     By failing to provide Roesel with the Underlying Data which served as the basis for their Investigative Findings, Defendants deprived Roesel of the opportunity to review the Underlying Data and rebut the Investigative Findings, only to then claim Roesel failed to "persuade HHS to lift the suspension" under 45 CFR 155.220(g)(5)(i)(B).

89.     It is unfair, arbitrary, capricious, and contrary to constitutional law for Defendants to purport to make Investigative Findings, use those Investigative Findings to suspend and terminate an agent/broker for a prolonged period, and feign to invite "rebuttal evidence" from an agent/broker, all while refusing to provide that agent/broker with the core facts that the agent/broker is supposed to rebut in the first place.

90.     After using unidentified and undisclosed (likely artificial intelligence-powered) "data analytics" and issuing Investigative Findings, it was arbitrary, capricious, and contrary to law for Defendants to: (a) refuse to provide the Underlying Data to Roesel; (b) refuse to reveal to Roesel the names of involved or complaining consumers—much less the actual information on which CMS relied in making a decision, refuse application of any standard of review; and then (c) fault Roesel for failing to "persuade" them that the Investigative Findings and their "reasonable suspicions" were baseless.

**VI.     Defendants Refused to Provide Facts and Data Underlying Their Decisions.**

91.     While CMS imposed a January 5, 2023, deadline for Roesel to request reconsideration of its December 6, 2023, decision to terminate Roesel's PY 2023 FFE Agreements and suspend Roesel for a three-year period, that 30-day period did not provide Roesel with a sufficient amount of time to rebut CMS's allegations or request reconsideration. As described *supra*, CMS denied Roesel's request for a mere 30-day extension of time to request reconsideration.

92.     Furthermore, despite multiple requests described *supra*, CMS never provided Roesel or his counsel with the information underlying its investigation or information necessary to rebut its Investigative Findings, including but not limited to its allegations regarding the 189 total consumers and the undisclosed data analytics referenced in its Suspension/Termination Letters and Attachments.

93.     Of the 179 consumers identified in Section 3 of the Attachment to the Notice of Suspension, during the suspension and reconsideration process, CMS merely provided Roesel with the first and last names of 129 consumers who allegedly submitted complaints in Plan Years 2022 through 2023.

94.    For those 129 consumers whose mere first and last names were provided, Defendants did not provide any additional information which would allow Roesel to identify each of those consumers or the basis of their complaints.

95.    Despite multiple requests, CMS never provided Roesel with, *inter alia*:

A.    The identity of fifty of the 179 consumers referenced in Paragraph 3(a) of the Attachment to the Suspension Letter, which amounts to approximately twenty-eight percent (28%) of those consumers;

B.    Additional identifying information, other than mere first and last names, of 129 of the 179 consumers referenced in Paragraph 3(a) of the Attachment to the Suspension Letter;

C.    The substance of the 189 complaints referenced in paragraphs 1 and 3 of the Attachment to the Suspension Letter;

D.    The identity of the 69 consumers who allegedly had their policies cancelled due to suspected fraud or alleged circumstances related to the suspected fraud;

E.    The underlying testimony provided during consumer interviews referenced in the Suspension Letter; and

F.    CMS's purported "data analytics" referenced in Paragraph 3(a) of the Attachment to the Suspension Letter—which appear to have arising from the use of artificial intelligence—supporting the claims that (A) there were days on which more policies were submitted than would be reasonably be possible by one A/B, (B) that a significant portion of applications used

common household income amounts, and (C) that a significant portion of applications used common work types.

96.    The foregoing demonstrates that Defendants were disinterested in reaching the truth or in having their suspicions rebutted. Their interest went no further than arbitrarily and capriciously going through the motions required by the regulations and ultimately upholding their initial decision(s).

97.    Upon information and belief, Defendants failed to actually investigate all, or a substantial number, of the complaints cited in the Investigative Findings. Instead, Defendants merely took the purported complaints of consumers at face value without evaluating the underlying information, and relied on consumer policies which were cancelled on the basis of "fraud" without substantiating consumers' unsupported allegations. Upon information and belief, all or a substantial number of the complaints cited in the Investigative Findings were false and baseless, and a substantial number of the complaints cited in the Investigative Findings were made in order for consumers to obtain financial incentives or avoid tax penalties related to their failure to report items to the Internal Revenue Service or otherwise. Defendants' decision to suspend and terminate Roesel arose in whole or in part from its failure to investigate the purported complaints regarding the Roesel.

98.    Upon information and belief, Defendants' "data analytics" and findings of "anomalous use of common" categories referenced in the Investigative Findings were the product of artificial-intelligence ("AI") or artificial-intelligence-generated content which Defendants arbitrarily accepted as true and accurate with inadequate testing and without legally sufficient review of Roesel's policies and practices during Plan Years 2022 and 2023. In conducting their investigation of Roesel, Defendants used novel, untested, and unreliable programs or software,

Defendants did not properly evaluate, review, or verify the basis for the content generated by the software, and Defendants heavily relied on unreliable system-generated data and information in deciding to suspend and terminate Roesel.

**VII.   Defendants Predetermined the Outcome and Preconceived Roesel's Termination Well Before Roesel's Suspension and Termination.**

99.     Upon information and belief, Defendants have contracted with a corporation by the name of General Dynamics Information Technology, Inc. ("GDIT") to generate Marketplace Program Integrity Contractor Risk Assessment Models (the "MPIC Risk Assessment Models") from as early as 2021 to the present.

100.    Upon information and belief, the MPIC Risk Assessment Models purport to rank thousands of agent/brokers on a risk scale, and purport to flag agent/brokers with certain "High-Risk Indicators.".

101.    Upon information and belief, the MPIC Risk Assessment Models are a "data analytics" referenced by the Defendants.

102.    Upon information and belief, Defendants have determined to keep the MPIC Risk Assessment Models secret from agent/brokers.

103.    Upon information and belief, the methods and systems underlying the MPIC Risk Assessment Models are fundamentally flawed. For example, rather than assist with the identification or rooting out of actual fraud or noncompliance, as a practical effect, the models arbitrarily single out agents/brokers with a higher number of policies or insurance applicants.

104.    Upon information and belief, the MPIC Risk Assessment Models contain highly inaccurate and unreliable artificial-intelligence-generated data and findings.

105.    Upon information and belief, Defendants have not verified that the data underlying GDIT's MPIC Risk Assessment Models are accurate, Defendants have failed to test, confirm, or

verify the reliability of GDIT's models, and Defendants have utilized those models to specifically target Roesel and other agent/brokers on Federal Exchanges.

106.    Upon information and belief, a campaign to arbitrarily terminate agent/brokers with high scores on the MPIC Risk Assessment Models began shortly after May 25, 2021, when Defendant Brooks-LaSure was confirmed as Administrator for CMS.

107.    Upon information and belief, since the confirmation of Defendant Brooks-LaSure, an unusually high number of agent/brokers have been terminated for purported "reasonable suspicion," without any findings or determinations of fraudulent or abusive conduct, and without regard for the termination process prescribed under the Agent/Broker Regulation.

108.    Upon information and belief, Roesel's termination was part of a predetermined campaign by Defendant Brooks-LaSure and the other Defendants to terminate an arbitrary number or percentage of agent/brokers who were ranked highly on Risk Assessment Models generated by GDIT, regardless of the merits, in order to improve CMS's internal metrics and create the false perception that Defendant Brooks-LaSure was actively rooting out bad actors.

109.    Upon information and belief, Defendants, upon receipt of the Risk Assessment Models generated by GDIT, began to target Roesel and other agents/brokers who were erroneously ranked highly on the flawed risk scale contained in those models.

110.    Upon information and belief, around February of 2022, CMS received an "MPIC Case Summary" regarding Roesel's status as an agent/broker which was generated by GDIT, which included references to a Risk Assessment Model.

111.    Upon information and belief, the Risk Assessment Model referenced in the February 2022 MPIC Case Summary was generated using novel, untested, and unreliable systems, including the potential use of artificial-intelligence-powered software. The Risk Assessment

Model, due to the unreliable underlying software and metrics, ranked Roesel highly on the Risk Assessment Model and flagged Roesel's data as statistically significant in regard to certain purported risk indicators.

112.    Upon information and belief, Defendants used the unreliable MPIC Risk Assessment Models in issuing the Investigative Findings referenced in Roesel's Suspension Letter, which contains substantially similar language to that used in MPIC Case Summaries generated by GDIT, including references to "common" data types and the data points referenced in Section 3 of the Investigative findings.

113.    Upon information and belief, the flawed MPIC Risk Assessment Models are insufficient to raise even a "reasonable suspicion" of fraudulent or abusive conduct as required under the Agent/Broker Regulations, and much less an actual finding or determination thereof.

114.    Upon information and belief, the purported "reasonable suspicion" referenced in the Investigative Findings and the ultimate Termination Notice in regard to Roesel is heavily based on the unreliable Risk Assessment Models, metrics, and rankings provided by GDIT.

115.    Upon information and belief, in relying on GDIT's models and "data analytics" and deciding to suspend and terminate Roesel, Defendants failed to consider the complaining customers' possible motives to lie; failed to properly investigate consumer claims of fraud; failed to consider that CMS's procedures allow for multiple agents to submit applications under a single individual's NPN; failed to consider that anomalies in demographic data could be the result of a nonrepresentative sample (such as Roesel's use of "lookalike audiences" in his advertising); and did not interview key witnesses, including but not limited to Roesel, the majority of the complainants cited in the Investigative Findings and/or Risk Assessment Models.

116.    Upon information and belief, GDIT's models and "data analytics" merely considered gross volumes of risk indicators, rather than percentages in comparison to a particular agent/broker's annual volume of consumer applicants. As a result, an agent/broker such as Roesel, who assisted a larger number of consumers than many other agent/brokers in light of his experience and team, was automatically and erroneously flagged and ranked highly on GDIT's models even though, upon information and belief, the percentage of complaining consumers was extraordinarily low.

117.    In accordance with the campaign tactics of Defendant Brooks-LaSure, upon information and belief, Defendants have also caused the Agent/Broker Regulations to be amended effective June 4, 2024. Specifically, effective June 4, 2024, reconsideration decisions are no longer to be made by the "HHS reconsideration entity." *See* 89 FR 26218, 26420 (Apr. 15, 2024) (amending 54 CFR 155.220(h)).

118.    Effective June 4, 2024, reconsideration requests will need to be submitted directly to the "CMS Administrator" rather than the "reconsideration entity," and the "CMS Administrator" is to "provide the agent, broker, or web-broker with a written notice of the reconsideration decision[.]" 89 FR 26218, 26420 (Apr. 15, 2024) (amending 54 CFR 155.220(h)). Upon information and belief, this change in regulation was sought by Defendant Brooks-LaSure to further increase her active involvement in the arbitrary termination of various agents/brokers.

## CLAIMS FOR RELIEF

### COUNT ONE
**(Declaratory Judgment Act and Administrative Procedure Act: Defendants' Agency Action Violated Roesel's Constitutional Rights)**

119.    Roesel repeats and incorporates by reference the preceding paragraphs contained in this Complaint as if fully set forth herein.

120.    Pursuant to 5 U.S.C. §706, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). The APA further provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. §702.

121.    Defendants' decision to suspend and terminate Roesel, and reject his reconsideration request, implicate Roesel's constitutional rights under the United States Constitution, including but not limited to Roesel's rights under the Due Process Clause of the Fifth Amendment.

122.    The Fifth Amendment protects both intangible and tangible property interests. There is ample precedent for acknowledging a property interest in contract rights as protected under the Fifth Amendment. In light of Roesel's status as an authorized agent/broker, Roesel had and has a property right protected by the Fifth Amendment of the United States Constitution. Moreover, the purpose of the Due Process Clause is to grant the Roesel the opportunity to present his case and have its merits fully judged prior to the deprivation of his property rights.

123.    Roesel's property rights are further emphasized by 45 CFR 155.220, which limited Defendants' ability to terminate Roesel's rights, and do not allow Defendants to impose the "penalty" of denying Roesel's right to assist consumers with Exchanges in future years unless there is an actual "failure to comply with the requirements in 45 CFR 155.220. *See* 45 CFR 155.220(k) (emphasis added).

124.    Defendants' suspension, termination, and reconsideration decisions were contrary to Roesel's constitutional rights—including the Due Process Clause of the Fifth Amendment—because Defendants deprived Roesel of property rights and decided to terminate Roesel's

agent/broker status and his corresponding property right to participate in the Exchange unjustifiably and without due process of law; utilized an unworkable and untenable process to terminate and suspend Roesel's aforementioned property rights; failed to provide the Roesel with the underlying factual information and thus failed to allow Roesel a reasonable opportunity to rebut the Investigative Findings; failed to meaningfully consider the evidence submitted by Roesel upon reconsideration; failed to institute a workable process regarding review of agents/brokers' compliance with standards of conduct; imposed consent and authorization requirements *ex post facto* when Defendants' applied standards first announced in June 18, 2023, to Roesel's actions that preceded that date; did not provide the Roesel with the opportunity to confront and rebut the allegations made by the consumers cited in the Investigative Findings; and based their decision upon unreliable, untested, and unverified systems and information.

125.    Defendants' suspension, termination, and reconsideration decisions also violated Roesel's due process rights because, rather than rely on Investigative Findings in the initial Suspension Letter, the subsequent Termination Notice and Reconsideration decisions provided a constantly moving target, wherein new and additional purported manners of noncompliance of bases for termination were added. The evolving bases for the termination deprived Roesel of the opportunity to rebut all purported bases for Defendants' termination decision.

126.    Defendants' suspension, termination, and reconsideration decisions also violated Roesel's due process rights because there was no neutral adjudicator overseeing the suspension, termination, and reconsideration process, and because (as alleged *supra*), the decision to initiate the suspension and termination process was part of a preconceived campaign—spearheaded by Defendant Brooks-LaSure and beginning before Plan Year 2022—to target and terminate Roesel and an arbitrary number of other agent/brokers who ranked highly on the highly unreliable MPIC

Risk Assessment Models generated by GDIT. The campaign to terminate Roesel was predetermined as early as May of 2021, when Defendant Brooks-LaSure was first confirmed as Administrator of CMS, and the decision to terminate Roesel was preconceived as early as May of 2021, well before Roesel received the Suspension Letter in October of 2023. Based on this campaign by Defendants, Roesel never actually had a chance or opportunity to persuade Defendants to reconsider their decisions regarding Roesel's suspension and termination.

127.    The suspension, termination, and reconsideration provisions in 45 CFR 155.220 are also unconstitutionally void-for-vagueness and do not provide fair notice to agents/brokers regarding the applicable standards of conduct, or their rights during the suspension, termination, and reconsideration process. 45 CFR 155.220 is void-for-vagueness because it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Specifically, while 45 CFR 155.220 vaguely refers to "reasonable suspicion" to justify Defendants' suspension of an agent/broker, and refers to an agent/broker's potential to "persuade HHS" to lift a suspension, the federal regulations do not provide any guidance on, *inter alia*, what may give rise to such a "reasonable suspicion," what type of "rebuttal evidence" is sought by Defendants in attempting to rebut a suspension or termination, the burden of "persua[sion]" applicable to agents/brokers, what information must be provided to an agent/broker; and what if anything Defendants must consider during the rebuttal process. Furthermore, the Agent/Broker Regulation refers generally to "fraud" and "abusive conduct," but fails to describe or lay out the elements of fraudulent or abusive conduct, fails to include a *mens rea* requirement, and thus it is impermissibly vague as to what actual conduct is prohibited under the Agent/Broker Regulation.

128.    45 CFR 155.220 is also void-for-vagueness to the extent it specifically authorizes and encourages arbitrary and discriminatory enforcement in light of the above-mentioned

34

definitional vagaries and because (as was the case here) it leaves the agent/broker's burdens upon suspension, termination, and reconsideration completely undefined, imposes no requirement or guidance as to the level of information and data that must be provided to an agent/broker by CMS during the process, and forces agents/brokers to conduct a shadowboxing exercise because CMS is allowed to rely on "Investigative Findings" on the one hand while failing to provide the agent/broker with the factual information supporting those very findings on the other. Such a standard was not contemplated by the ACA and is unconstitutional and void as a matter of law.

129.    To the extent the Agent/Broker Regulation's termination procedures and reconsideration process place the burden on *Roesel* to prove a negative—*i.e.*, that he did *not* engage in fraud—beyond a reasonable suspicion, or allow Defendants to rely on secret evidence, or allow Defendants to unilaterally shift the burden and heighten the standard of proof, such standards are fundamentally unfair, violate procedural due process, and would make judicial review of Defendants' agency decisions impossible.

130.    Because Defendants' suspension, termination, and reconsideration process that is in place, and the process applied to Roesel and other Agents/Brokers, are "contrary to [Roesel's] constitutional right, power, privilege, or immunity," Roesel is entitled to relief under 5 U.S.C. §§ 702, 706(2)(B).

### COUNT TWO
**(Declaratory Judgment Act and Administrative Procedure Act: Defendants Exceeded Their Statutory Authority Under the Affordable Care Act)**

131.    Roesel repeats and incorporates by reference the preceding paragraphs contained in this Complaint as if fully set forth herein.

132.    Pursuant to 5 U.S.C. § 706, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction,

authority, or limitations" or "or otherwise not in accordance with law." 5 U.S.C. § 706(2)(C), (A).

The APA further provides that "[a] person suffering legal wrong because of agency action, or

adversely affected or aggrieved by agency action within the meaning of a relevant statute, is

entitled to judicial review thereof." 5 U.S.C. §702.

133.   The suspension, termination, and reconsideration process implemented by

Defendants exceeds their statutory authority under the ACA and therefore is independently

unlawful.

134.   The ACA required the Secretary to promulgate rules and regulations regarding

Exchanges, including participation by agents/brokers in Exchanges. *See* 42 U.S.C. § 18031. The

ACA does not contain any language, let alone express and unambiguous language, authorizing

Defendants to suspend or terminate agents or brokers, much less based on mere reasonable

suspicion; does not contain language allowing Defendants to unilaterally withhold the factual basis

for its decisions from an agent/broker during the suspension, termination, or reconsideration

process; and does not allow Defendants to apply specific consent and authorization documentation

requirements *ex post facto*. Furthermore, the ACA does not contain any language regulating or

allowing Defendants to use automated or AI-generated content or findings in determining whether

to suspend or terminate an Agent or Broker such as the Roesel, nor does it authorize Defendants

to base its decisions on the unreliable data analytics in Risk Assessment Models.

135.   The regulations promulgated by HHS and CMS, and enforced by the Secretary,

regarding agents/brokers, are devoid of guidance, unconstitutionally vague in favor of Defendants,

and do not provide for a workable reconsideration process. These provisions violate the mandates

imposed by the ACA, including mandates to implement workable procedures and rules governing

Exchanges, agents, and brokers. *See* 42 U.S.C. § 18031(d)(4).

136.    Here, the pertinent regulations in 45 CFR 155.220 regarding suspension, termination, and reconsideration, and the actions of Defendants concerning the same, are unconstitutionally vague, incomplete, unconscionable, and in violation of the ACA.

137.    Because the ACA does not authorize the process Defendants have in place and Defendants' actions and omissions regarding the suspension, termination, and reconsideration process applicable to Roesel and other agents/brokers, Defendants' actions are "in excess of statutory authority" and "not in accordance with law." They are not entitled to deference. Accordingly, Roesel is entitled to relief under 5 U.S.C. §§ 702, 706(2)(A), (C).

<u>**COUNT THREE**</u>
**(Declaratory Judgment Act and Administrative Procedure Act: In the Alternative, Defendants Failed to Follow Their Own Agent/Broker Regulation in Terminating Roesel)**

138.    Roesel repeats and incorporates by reference the preceding paragraphs contained in this Complaint as if fully set forth herein.

139.    Pursuant to 5 U.S.C. § 706, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations" or "or otherwise not in accordance with law." 5 U.S.C. § 706(2)(C), (A). The Court may also review acts taken "without observance of procedure required by law." *Id.* 702(d). The APA further provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. §702.

140.    In the alternative, even assuming *arguendo* that the suspension, termination, and reconsideration rules and procedures in place do not exceed Defendants' statutory authority under the ACA, Defendants actions violated the Administrative Procedures Act because the Defendants

failed to follow their own Agent/Broker Regulation when they suspended and terminated Roesel and failed to meaningfully reconsider those decisions thereafter.

141.    As described in 45 CFR § 155.220(g)(5) and (h), Defendants' actions were in excess of statutory jurisdiction and contrary to law because, despite multiple requests, Defendants failed to provide Roesel with the Underlying Data—and thus failed to allow Roesel to submit "rebuttal evidence"—before the Notice of Termination was issued, and before the Reconsideration Decision was made.

142.    The language in the Termination Notice demonstrates that Defendants patently misread the Agent/Broker Regulation, which allows for *suspension* under paragraph (5)(i)(A) "if HHS reasonably suspects" fraudulent or abusive conduct. 45 CFR § 155.220(g)(5)(i)(A). Only when a suspended agent/broker fails to "rebut the allegation[s]" and "does not persuade HHS to lift the suspension" can Defendants consider termination "for cause under ***paragraph (g)(5)(ii)*** of this section." *Id.* (g)(5)(i)(B) (emphasis added). In failing to make an actual "finding or determination" of fraudulent or abusive conduct, Defendants misinterpreted the Agent/Broker Regulations in direct violation of the APA. The Agent/Broker Regulation expressly distinguishes the standard for suspending an agent/broker from the standard for terminating an agent/broker.

143.    By making a distinction between "reasonable suspicion" for purposes of a suspension under paragraph (g)(5)(i) and a "finding or determination" for purposes of a termination under paragraph (g)(5)(ii), the Agent/Broker Regulation implicitly requires a finding or determination to be based on a higher standard than mere "reasonable suspicion" in order for an agent/broker to be terminated. By making such a distinction, the Agent/Broker Regulation implicitly imposes a burden of proof of a preponderance of the evidence or higher for Defendants

to make a "finding or determination" of fraudulent or abusive conduct. Defendants made no such finding here and improperly relied on a "reasonable suspicion" standard in the Termination Notice.

144.    To the extent Defendants cite noncompliance as the reason for terminating Roesel—including purported failure to use proper consent and authorization procedures—Defendants did not follow to proper procedure required for termination of an agent/broker for noncompliance. The Agent/Broker Regulations requires "a *specific finding* of noncompliance or pattern of noncompliance" which "is *sufficiently severe*" if Defendants wish to "terminate an agent's, broker's, or web-broker's agreement with the Federally-facilitated Exchange for cause." 45 CFR § 155.220(g)(1) (emphasis added). The Agent/Broker Regulations also require Defendants to give Roesel a 30-day period to cure. *Id.* Defendants never made any such specific findings, and Defendants did not provide Roesel with any opportunity to cure any purported noncompliance.

145.    Furthermore, the Agent/Broker Regulation requires factual findings of Defendants to be "specific," and Defendants' decision to base their findings on "data analytics" and AI-generated content violate that requirement. Thus, even assuming *arguendo* that the processes set forth in 45 CFR § 155.220 are lawful, Defendants are entitled to relief under the APA because Defendants disregarded those standards in deciding to suspend and terminate Roesel's status as an agent/broker until December of 2026.

146.    Because Defendants' actions in failing to follow their rules and procedures regarding suspension, termination, and reconsideration were "not in accordance with law" and the actions were taken "without observance of procedure required by law," even assuming *arguendo* that the rules and procedures are lawful, Roesel is entitled to relief under 5 U.S.C. §§ 702, 706(2)(A), (C), (D).

## COUNT FOUR
**(Declaratory Judgment Act and Administrative Procedure Act: Defendants' Findings and Conclusions are Arbitrary, Capricious, and an Abuse of Discretion)**

147.    Roesel repeats and incorporates by reference the preceding paragraphs contained in this Complaint as if fully set forth herein.

148.    Pursuant to 5 U.S.C. § 706, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA further provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. §702.

149.    In failing to consider Roesel's rebuttal evidence during the suspension, termination, and reconsideration processes, Defendants' violated the APA, relied on inappropriate factors, ignored critical issues, and reached decisions which were flatly contradicted by the evidence.

150.    Defendants further violated the APA because they failed to respond to significant points and failed to consider relevant factual evidence provided by the Roesel. Furthermore, during Defendants' "reconsideration" process, Defendants merely rubber-stamped their own prior findings in upholding the suspension and termination of Roesel's status as an agent/broker, withheld pertinent information from the Roesel, and did not allow Roesel an opportunity to meaningfully rebut Defendants' claims or findings.

151.    Defendants' actions and decisions were never based on a "reasonable suspicion" to begin with, and Defendants did not substantiate any of their agency actions with a finding or determination of fraudulent or abusive conduct. Instead, to arrive at a predetermined outcome,

Defendants relied blindly on GDIT's models and "data analytics," Defendants failed to consider the complaining customers' possible motives to lie; failed to properly investigate consumer claims of fraud; failed to consider that CMS's policies allow for multiple agents to submit applications under a single individual's NPN; failed to consider that anomalies in demographic data could be the result of a nonrepresentative sample (such as Roesel's use of "lookalike audiences" in his advertising); and did not interview key witnesses, including but not limited to Roesel, the majority of the complainants cited in the Investigative Findings and/or Risk Assessment Models, or the insurance carriers who cancelled policies on the basis of allegations of "fraud."

152.    As described *supra*, while Defendants failed to provide Roesel with the factual evidence which they purport supported their Investigative Findings and ultimate decision to terminate Roesel's status as an agent/broker, Roesel did present Defendants with specific rebuttal evidence in October of 2023 and in his formal Request for Reconsideration on January 5, 2024. Roesel described the Website processes—including the verification, consent, authorization, and enrollment processes—in detail to Defendants, and provided information specific to the allegedly aggrieved consumers, yet Defendants disregarded the evidence provided by Roesel and merely rubber-stamped their "reasonable suspicion" of fraud upon reconsideration.

153.    Because Defendants' "action, findings, and conclusions" described above were "arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law," and not supported by substantial evidence, Roesel is entitled to relief under 5 U.S.C. § 706(2)(A).

## COUNT FIVE
### (Declaratory Judgment Act and Administrative Procedure Act:  The Defendants' Findings and Conclusions Are Not Warranted by the Facts)

154.    Roesel repeats and incorporates by reference the preceding paragraphs contained in this Complaint as if fully set forth herein.

41

155.    Pursuant to 5 U.S.C. § 706, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . unwarranted by the facts . . . ." 5 U.S.C. § 706(2)(F). The APA further provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. §702.

156.    Defendants violated the APA because their decisions to Suspend and Terminate Roesel were unwarranted by the facts. Roesel did not engage in any fraudulent or abusive conduct, and did not engage in noncompliance, as laid out in detail *supra*, and as shown by Roesel during the post-Suspension and reconsideration process, including in his Affidavit, Roesel's explanation of the operation of the Website, how Roesel obtained consumer consent, authorization, and implemented various screening procedures, including consumer identification and information verification procedures, and including the third-party verification services utilized by Roesel in Plan Years 2022 and 2023. As described *supra*, during the time period relevant to Defendants' suspension and termination of Roesel, CMS did not prescribe any standard format or have clear guidelines for obtaining consumer authorization or consent. And even if such guidelines did exist, any failure to follow those guidelines would at most constitute noncompliance under paragraph (g)(1) of the Agent/Broker Regulation, *not* fraudulent or abusive conduct under paragraph (g)(5).

157.    There were no specific findings made, and there was no evidence whatsoever, cited by Defendants that could demonstrate that Roesel had the requisite *mens rea* or engaged in fraud or abusive conduct. Nor were there any findings or determinations that Roesel engaged in "sufficiently severe" noncompliance, and any such finding would be unwarranted by the facts.

158.    Because Defendants' "action, findings, and conclusions" described in this Complaint were "unwarranted by the facts", Roesel is entitled to relief under 5 U.S.C. § 706(2)(F).

**COUNT SIX**
**(Declaratory Judgment Act and Administrative Procedure Act: In the Alternative, the
Three-Year Suspension Period is Arbitrary, Capricious, and an Abuse Of Discretion)**

159.    Roesel repeats and incorporates by reference the preceding paragraphs contained
in this Complaint as if fully set forth herein.

160.    Pursuant to 5 U.S.C. § 706, a "reviewing court shall . . . hold unlawful and set aside
agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of
discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA further
provides that "[a] person suffering legal wrong because of agency action, or adversely affected or
aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review
thereof." 5 U.S.C. §702.

161.    In the alternative, even assuming *arguendo* that the Defendants' conduct that led
to the suspension and termination were not arbitrary, and capricious, Defendants' decision to
impose the penalty of preventing Roesel from participating in Exchanges up to and through
December 6, 2026, a 3-year period, was itself utterly disproportionate, arbitrary, capricious, an
abuse of discretion, and otherwise not in accordance with law as provided in 5 U.S.C. § 706(2)(A).

162.    Even assuming *arguendo* that Defendants were correct in having a reasonable
suspicion that the Roesel did not obtain proper consent and/or authorization from the consumers
that Defendants' mentioned in the Suspension, Termination, and Reconsideration letters—which
Roesel disputes—such instances of purported failure to obtain consent or authorization were rare,
*de minimis*, and did not justify the harsh decision made by Defendants to suspend Roesel's status
as agent/broker until December of 2026.

163.    While Roesel disputes that there are any issues regarding the 10 consumers
identified in Section 1 of the Attachment to the Notice of Suspension or the 179 unidentified

consumers in Section 3 of the Attachment to the Notice of Suspension, this total of 189 consumers does not provide a reasonable basis for Defendants to seek to terminate Roesel for Plan Year 2023 or for Defendants to suspend Roesel for a three-year period. Even assuming *arguendo* that Defendants reasonably suspected that non-compliance had occurred, Defendants' decision was inappropriate and disproportionate since it was based on the complaints of approximately 0.003% of the approximately 59,000 total consumers which Roesel assisted during Plan Years 2022 and 2023.

164.    Rather than terminate Roesel and suspend him for a 3-year period, Defendants had a plethora of other options and courses of action that could have been taken as a result of Defendants' purported suspicion. Instead, Defendants decided to suspend Roesel until an unnecessarily prolonged period of December 6, 2026. *See* 45 CFR § 155.220(k).

165.    Thus, even assuming *arguendo* that Defendants' decision to suspend and terminate was not arbitrary or capricious, Defendants' decision to implement a 3-year prohibition period is wholly disproportionate and inappropriate, and not tailored to Defendants' purported findings. The 3-year prohibition decision is an indicia of Defendants' malice, animus, and targeting of Roesel.

166.    Because Defendants' "action" and "conclusion" described above regarding the extent of the 3-year probation period was excessive, "arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law," and not supported by substantial evidence, even assuming *arguendo* its factual findings regarding purported violations of the Agent/Broker Agreement were not arbitrary or capricious, Roesel is still entitled to relief under 5 U.S.C. § 706(2)(A).

## COUNT SEVEN
**(Action for Injunctive Relief and Declaratory Judgment under the APA and Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202)**

167.    Roesel repeats and incorporates by reference the preceding paragraphs contained in this Complaint as if fully set forth herein.

168.    As set forth above, Roesel has standing to bring suit under the Declaratory Judgment Act,  28 U.S.C. §§ 2201-2202, and has alleged facts demonstrating existence of a substantial and continuing controversy between the Roesel and Defendants of sufficient immediacy and realty to warrant the issuance of injunctive relief and declaratory judgment.

169.    Roesel has been injured by the actions of Defendants, and he will likely suffer injury or a threat of repeated injury in the future. Specifically, Defendants improperly suspended Roesel's status as an Agent/Broker, a status which he utilized to assist various consumers applying for QHPs; Defendants' Agent/Broker Regulation, and Defendants' interpretation thereof, violated Roesel's constitutional rights and rights under the APA; Defendants misinterpreted and misapplied their own Agent/Broker Regulation in terminating his Agent/Broker status; and Defendants purported to terminate and suspend Roesel and seek to prevent Roesel from acting as an Agent/Broker on Exchanges for a three-year period; Defendants are preventing Roesel from using his NPN to participate as an Agent/Broker at present; and Defendants have sought to prevent Roesel from participating on Exchanges going forward and through December 6, 2026. Thus, Roesel has suffered past, present, and future injuries in fact.

170.    This Court has authority and jurisdiction to issue the Declaratory and Injunctive relief requested below in the Prayer for Relief under the APA, 5 U.S.C. §§ 702–706 and it would be within the Court's discretion to grant the relief requested below as to Defendants' final agency action referenced in this Complaint.

171.    The APA specifically allows and provides for injunctive and declaratory relief, and the APA also allows the Court to "issue all necessary and appropriate process to postpone the

effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The Court also has the authority under the APA to "(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; (E) unsupported by substantial evidence . . . ; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." 5 U.S.C. § 706. Roesel is entitled to declaratory and injunctive relief because, as described above, Defendants' actions violate the various prongs of 5 U.S.C. § 706(2).

172.    For the foregoing reasons, Roesel has met the standing, justiciability, injury-in-fact, and other requirements to obtain both Declaratory and Injunctive relief requested in the Prayer of Relief below, which is expressly incorporated herein by reference, under the APA and the Declaratory Judgment Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Philip Roesel respectfully prays that this Court:

A.    Enter judgment in favor of Roesel;

B.    Issue an order and judgment declaring that Defendants violated the Affordable Care Act and/or the APA in suspending and terminating Roesel and in prohibiting Roesel from completing FFE registration until December 6, 2026;

C.    Void the termination and suspension of Roesel's FFE Agreements and vacate the decision to prohibit Roesel from entering into agreements with CMS and completing FFE

registration until December 6, 2026;

D.      Preliminarily and permanently enjoin Defendants, their employees, and their agents from enforcing Defendants' Suspension, Termination, and Reconsideration decisions regarding Roesel;

E.      Preliminarily and permanently enjoin Defendants from prohibiting Roesel from entering into agreements with CMS and completing FFE registration;

F.      Preliminarily and permanently enjoin Defendants, their employees, and their agents from preventing Roesel from using his NPN and Exchange User ID to facilitate consumer health insurance enrollments through the Exchanges;

G.      Preliminarily and permanently enjoin Defendants from preventing Roesel from participating in the FFE Exchanges as an Agent/Broker based on the purported facts or the consumers which gave rise to the Suspension and Termination at issue in this action;

H.      Declare that the Suspension, Termination, and Reconsideration process implemented by Defendants regarding agents and brokers, including but not limited to the process Defendants used regarding Roesel, exceeds Defendants' statutory authority under the ACA;

I.      Declare that the Suspension, Termination, and Reconsideration process implemented by Defendants regarding agents and brokers, including but not limited to the process Defendants used regarding Roesel, is violative of Roesel's rights under the United States Constitution;

J.      Declare that Defendants violated the ACA and/or APA by failing to follow their own rules and processes in deciding to suspend and terminate Roesel, and during Defendants' purported reconsideration process;

K.      Declare that Defendants violated the APA because the factual findings and

decisions underlying the Suspension, Termination, and purported Reconsideration regarding Roesel were baseless, arbitrary, capricious, and an abuse of discretion and otherwise not in accordance with law;

L.      Declare that Defendants violated the APA because Defendants' decision to prevent Roesel from participating in Exchanges for a 3-year period was itself in excess of Defendants' statutory authority, excessive, arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law;

M.      Declare that CMS's conclusion was unwarranted by the facts;

N.      Vacate Defendants' Suspension, Termination, and Reconsideration decisions regarding Roesel;

O.      Preliminarily and permanently enjoin Defendants from suspending or terminating Roesel on the basis of actions or facts which Defendants allege occurred prior to or during Roesel's Plan Year 2023 Exchange Agreement with Defendants;

P.      Award attorneys' fees and costs to Roesel in accordance with applicable law; and

Q.      Provide such further relief as the Court may deem just and proper.

Respectfully submitted this the 8th day of May, 2024.

[Signatures on the following page]

**WOMBLE BOND DICKINSON (US) LLP**

By:     /s/ Michael E. Clark
        Michael E. Clark
        (Texas Bar ID: 04293200)
        WOMBLE BOND DICKINSON (US) LLP
        707 Texas Avenue., Suite 2100
        Houston, TX 77002
        Telephone: (346) 998-7807
        Email: Michael.Clark@wbd-us.com

        Christopher W. Jones
        (N.C. State Bar No. 27265)
        Jesse Schaefer
        (N.C. State Bar No. 44773)
        Brian F. Castro
        (N.C. State Bar No. 53412)
        555 Fayetteville Street, Suite 1100
        Raleigh, North Carolina 27601
        Phone: (919) 755-8173
        Fax: (919) 755-6771
        Email: Chris.Jones@wbd-us.com
               Jesse.Schaefer@wbd-us.com
               Brian.Castro@wbd-us.com
        *Pro Hac Vice Applications Forthcoming*
        *Counsel for Philip Roesel*